Gordon BREEDING, Tom Haggard and Charlie Bowers, individually and d/b/a Century 21 Breeding Realty and Auction, Plaintiffs/Appellants,

v.

Robert P. SHACKELFORD, Jr., Don H. Shackelford and the Estate of Robert P. Shackelford, individually and d/b/a the Shackelford Company, a Tennessee General Partnership; the Shackelford Corporation, a Tennessee Corporation; the Shackelford Development Corporation, a Tennessee Corporation, Defendants/Appellees.

Court of Appeals of Tennessee,
Western Section.

May 19, 1994.

Application for Permission to Appeal
Denied by Supreme Court
Sep. 26, 1994.

Randi B. Rich, Holmes, Rich & Sigler, Jackson, for appellants.

Jerry E. Mitchell, Thomason, Hendrix, Harvey, John & Mitchell, Memphis, for appellees.

TOMLIN, Presiding Judge (Western Section).

Gordon Breeding, Tom Haggard and Charlie Bowers, individually and d/b/a Century 21 Breeding Realty and Auction ("plaintiff" or "Century 21"), filed suit in the Chancery Court of Hardin County against Robert P. Shackelford, Don H. Shackelford, the estate of Robert P. Shackelford individually and d/b/a the Shackelford Corporation, as well as the Shackelford Development Corporation ("defendants" or "Shackelford"), seeking to recover a real estate commission resulting from the alleged breach of an open listing real estate agreement between defendants and plaintiff. Plaintiff filed a motion for summary judgment which was denied by the chancellor. The chancellor held that while the material facts were undisputed, the defendants had not breached the real estate listing agreement. Century 21 has appealed, raising a single issue: whether the trial court erred in holding on the undisputed facts, as a

matter of law, that defendants did not breach the real estate listing with plaintiff. We find no error and affirm.

Following the hearing on plaintiff's summary judgment motion, the chancellor filed an extensive memorandum opinion in which he set forth what he found to be the undisputed facts in this case. The judgment, entered by consent of the parties, contains stipulations concerning the undisputed facts and reads in part as follows:

IT FURTHER APPEARS to the Court, based upon the undisputed facts in the case, that a sale or transfer of the property has not taken place as contemplated by the written listing agreement between the parties.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED BY THE COURT that based upon the undisputed facts of the case, the plaintiff is not entitled to a judgment as a matter of law.

IT FURTHER APPEARING to the Court that in the Court's written opinion previously filed with the Court that it is stated that the Court's memorandum addresses only the plaintiffs' claim for a real estate commission based on a written listing agreement and does not address claims for a commission based on any oral agreement of the parties. The parties hereto, by consent, as evidenced by their signatures herein, stipulate and agree that plaintiffs' claim in the Complaint for a commission based upon an oral agreement is without legal or equitable merit and that plaintiffs rely solely on the written listing agreement for their claim for a real estate commission in the cause. The parties further agree and stipulate that to the extent there are any undisputed facts, such would not alter the stated judgment in favor of the defendants, even if they were decided in favor of plaintiffs.

IT FURTHER APPEARS to the Court that the plaintiffs have filed a Notice of nonsuit against Charlie and Gary McCrory, d/b/a The McCrory Company, and therefore, it is the intent of the parties hereto by and with their consent that this Order constitutes a final order of judgment in the cause in favor of the defendants,

Robert P. Shackelford, Jr., Don H. Shackelford and the estate of Robert P. Shackelford, Individually and d/b/a The Shackelford Company, a Tennessee Partnership; The Shackelford Corporation; and The Shackelford Development Corporation.

As we understand the chancellor's memorandum opinion and the consent judgment, neither party disagrees with the chancellor's finding of the undisputed facts. Accordingly, this court appropriates and adopts the factual findings of the chancellor as they appear in his memorandum opinion:

1. A listing agreement was entered into on August 19, 1988, between the Shackelford Company, a partnership composed of R.P. Shackelford, Jr. and Don Shackelford, brothers, and Century 21. The listing was a six month open listing agreement for the sale of the Shackelford property and was to expire on February 19, 1989.

2. The listing agreement states a listing price for the property of $1,900,000 and provides for a payment of a real estate commission to Century 21 of six (6%) percent of the sales price.

3. A portion of the listing agreement provides as follows:

I reserve the right to sell the property to a buyer procured by myself or through another agent and in such case no commission or other charge shall be due you, provided such sale or transfer is not made directly or indirectly to or through your prospect.

The listing has an expiration date of February 19, 1989, but provides:

... however, if within one year after the termination of this agreement, I sell or transfer this property to a prospect procured by you prior to its termination, I shall pay your commission.

4. On or about October 4, 1988, Gary McCrory, a partner in The McCrory Company of Memphis, contacted Charles Bowers, a real estate agent for Century 21, requesting that Bowers locate approximately 400 to 500 acres of property for a fishing lake or development. Bowers then showed McCrory on several occasions the Shackelford property as well as adjacent

property known as the Walker heirs property which joins the Shackelford property.

5. On November 9, 1988, on behalf of the McCrory Company, Century 21 submitted to the Shackelfords an option to purchase the Shackelford property, but the option was rejected by the Shackelfords.

6. The Walker heirs property was purchased by the McCrory Company for the amount of $800,235 pursuant to a sales contract negotiated by Century 21 and the real estate commission paid.

7. Bowers, on behalf of Century 21, arranged an initial meeting between McCrory and the Shackelfords to consider the possibility of forming a joint venture between the Shackelfords and the McCrory Company.

8. A joint venture agreement was reduced to writing between the Shackelfords and The McCrory Company on April 30, 1989, a date which was within one year of the termination of the listing agreement. The joint venture was designed for the development and sale of the Walker heirs property now owned by McCrory and the Shackelford property.

9. Various corporations owned by the Shackelford family have certain rights in the property listed by Century 21 for sale which ultimately became encompassed in the joint venture.

a. The Shackelford Company initially owned the listed property and still maintains legal title to the property.

b. The Shackelford Company sold the "rights to take title" to the Shackelford Corporation prior to the listing agreement.

c. The Shackelford Corporation "optioned" the property to the Shackelford Development Corporation which became a party to the joint venture. Any interest of the joint venture in the Shackelford property was subject to the option granted the Shackelford Development Company.

10. The Shackelford property and the adjacent Walker heirs property owned by McCrory have been developed as a residential resort area on Pickwick Lake pursuant to the joint venture agreement.

Since the formation of the joint venture, conveyances of individual lots to individual buyers have been made from the Shackelford property with title being conveyed by the Shackelford Company as record title holder to the property. In accordance with the terms of the option agreement, the Shackelfords have received sixty (60%) percent of the sales proceeds from each lot which as of August 1990 totaled $1,746,600.

11. The terms and provisions of the joint venture agreement as well as the option to purchase granted the joint venture by the Shackelfords are not in dispute.

Simply put, the issue is whether based on the above undisputed facts the entering into a joint venture by Shackelford with McCrory constituted a "transfer" as contemplated by the real estate listing agreement, to wit:

[H]owever, if within one year after the termination of this agreement, I sell or transfer this property to a prospect procured by you prior to its termination, I shall pay you your commission . . .

It is undisputed that during the six month term of the agreement, an option to purchase was presented by Century 21 on behalf of McCrory, which Shackelford rejected. Within one year of the expiration date of the listing agreement, Shackelford and McCrory entered into a joint venture agreement ("JVA") for the purpose of developing and selling their respective properties that were to be combined into a subdivision.

The JVA was entered into between McCrory and a soon to be formed corporation, Shackelford Development Corporation ("SDC"), with the joint venture having the responsibility of developing both the subject property and the Walker heirs property. SDC was given an option for the acquisition of the property from the Shackelford Corporation ("SC"). Prior to the listing of the property with plaintiff, the Shackelford Corporation had acquired the right to take title to the subject property from the Shackelford Company. Under the terms of the JVA, the Shackelford property was to be developed in accordance with plans and specifications agreed upon between the parties to the JVA

with SDC agreeing that the subject property could be developed prior to the conveyance of title to the affected parts of the property. As pertinent to the issue under consideration, the JVA further provided:

### DEVELOPMENT PROPERTY

3. *Purchase of Development Property.* Development is the optionee under the terms of an option agreement ("Development Option") for the acquisition of the Development Property from the Shackelford Corporation. A copy of the Development Option is attached hereto and made a part hereof as *Exhibit C.*

Development agrees to cause the property covered by the Development Option to be conveyed to the Development Joint Venture upon the payment in cash by the Development Joint Venture of the consideration required to be paid under the terms of the Development Option.

The Development Property shall be developed in accordance with development plans and specifications agreed upon between the parties with Development agreeing that the development of the Development Property may proceed prior to the conveyance of title to the affected parts of the Development Property.

The Development Joint Venture is empowered to acquire, own, hold, improve, develop, operate and manage the Development Property as well as other real property, and the improvements to be constructed thereon, and to do all things reasonably incident thereto, including mortgaging, selling, leasing and subleasing, or otherwise disposing of any real property owned by it and the improvements thereon at any time, in order to accomplish the purpose of the Development Joint Venture; however, the Development Joint Venture shall have no power or authority to mortgage or encumber in any manner, shape or form, any property belonging to Development title to which has not been conveyed to the Development Joint Venture.

4. *Term.* The term of the Development Joint Venture shall commence on the date of execution of this Agreement by both parties and any action commenced prior to the execution of this Agreement in furtherance of the Development Joint Venture shall be ratified and accepted by the execution of this Agreement and shall continue until: ...

(c) Completion of the business of the Development Joint Venture and sale, disposal, or distribution of all the property of the Development Joint Venture coupled with the sale, disposal, or distribution of the Walker Heirs Property, as provided hereinafter, as well as the disposal or distribution of all other assets of the Development Joint Venture.

5. *Construction Contract.* The McCrory Company shall provide and negotiate all construction contracts for the development and construction of the Development Project in accordance with the plans and specifications. The McCrory Company shall be paid only on a monthly basis at the rate of five percent (5.00%) above the actual cost of work and materials put into the project.

6. *Profits and Losses.* Net profits and losses shall be shared between the parties in the following percentages:

The McCrory Company—60%

Development Company—40%

7. *Determination of Profits and Losses.* Net profits and losses shall be determined upon sale of all the Development Joint Venture Property and the Walker Heirs Property, but before termination of the Development Joint Venture and before final distribution of the proceeds therefrom.

.    .    .    .    .

9. *Financing and Projected Budget.* The McCrory Company agrees to procure all financing necessary for development of the Development Property as well as all monies necessary to carry on the business of the Development Joint Venture. Such financing shall be for the account and risk of the McCrory Company....

10. *Duties.* The general duties of the parties shall be as follows: (a) All major decisions affecting the Development Project shall specifically require written approval of both parties and execution of all documents related to such matters must be

made by both parties in order to be binding on the joint venture or enforceable against either party. The following are examples of such major decisions, but shall not be deemed to be inclusive.

1. Approval of plans and specifications;

2. Any financing for the project, including but not limited to construction and permanent financing and all debt instruments of any kind;

3. Any expenditure or contracts for nonbudgeted items.

.    .    .    .    .

12. *Limitation on Transfer and Partition.* Each party has entered into this Development Joint Venture in reliance upon the abilities of the other party, and neither party shall assign, sell, mortgage, hypothecate, or charge its interest in the Development Joint Venture, or any portion thereof, without obtaining the prior written consent of the other party. Any attempt to assign, sell, transfer, mortgage, hypothecate or charge in violation of this provision shall be void. Both parties hereby specifically waive any right to have any property of the Development Joint Venture partitioned.

.    .    .    .    .

16. *The Walker Heirs Property and any Other Adjoining Property Acquired by any Other Parties to be Treated as Part of the Development Joint Venture.* For the purposes of paragraph 4 c above, the development of the Walker heirs property and any other adjoining property acquired by either of the parties and the distribution of the proceeds thereof shall be considered a part of the business of the development joint venture.

Immediately following the formation of the joint venture, SC granted SDC an option on the Shackelford property that provided in part as follows:

### OPTION FOR PURCHASE OF REAL ESTATE

This Option granted the 1st day of May, 1989, by The SHACKELFORD CORPO-RATION, a Tennessee Corporation, hereinafter called the Optionor to SHACKELFORD DEVELOPMENT CORPORATION, a Tennessee Corporation, hereinafter called the Optionee.

1. *Grant of Option.* The Optionor, in consideration of the [amount of] $1.00, paid by the Optionor, the receipt whereof is hereby acknowledged, hereby grants to the Optionee the exclusive right at [ ] option for and during of time beginning on the date of this Option and ending on December 31, 1991, to purchase a certain parcel of land located in the ___ Civil District of Hardin County, Tennessee, containing 337 acres described on Exhibit "A" attached hereto for the price of $1,900,000.00 adjusted as hereinafter provided to be paid upon delivery of deeds.

2. *Exercise of Option.* In case the Optionee shall elect to purchase the property, it shall signify such election by written notice thereof, served upon the Optionor within the time above limited and thereafter Optionee shall have thirty (30) days from delivery of such notice to complete the purchase.

3. *Conveyance.* It is understood that Optionee intends to subdivide and develop the subject property into lots for sale to various parties and Optionor agrees that this option may be exercised in parts as various lots are sold provided that Optionor receives not less than 60% nor more than 80% of the purchase price of each lot as it is sold, the percentage to be determined by Optionor. As the option is exercised and lots are sold, Optionor shall cause to be delivered to Optionee or its assigns a good and marketable title in fee simple to said property free and clear of all taxes, except real property taxes for 1989 which will be paid by the Grantees and other encumbrances and shall convey the same by general warranty deed....

As a result of all the above, McCrory, as the financier and developer, developed the Walker heirs and Shackelford properties in accordance with the JVA. Upon the sale of each individual lot to the public from the subject property, the Shackelford Corporation would convey title to the individual buyer. No title to any part of the subject prop-

erty was ever conveyed to the joint venture or to McCrory.

█ Plaintiff contends that pursuant to the provisions of the JVA, the Shackelfords "transferred" the property to McCrory so as to entitle it to a commission under the listing agreement. Defendants, on the other hand, while not denying that McCrory was a prospect obtained by Century 21 within the terms of the listing agreement, contend that there never was a "sale" or "transfer" of the subject property within the time period contemplated to McCrory.

█ A cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention consistent with legal principles. *Rainey v. Stansell,* 836 S.W.2d 117 (Tenn.App.1992). In seeking to find the intention of the parties, words in a contract should be given their usual, natural and ordinary meaning. *Bill Walker & Assocs., Inc. v. Parrish,* 770 S.W.2d 764 (Tenn.App.1989).

In support of its position, plaintiff submits that the following definition of "transfer" that it contends should be used in analyzing this transaction:

> every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property....

While plaintiff credits this definition to Volume 26, page 563 of Tennessee Jurisprudence, the language in the definition comes directly from the Bankruptcy Code. 11 U.S.C.A. § 101(54) (West 1993). Congress created this definition of "transfer" in order to give courts the broadest possible latitude in enforcing the Bankruptcy Act. *See* 11 U.S.C.A. § 101 note (1993) (Revision Notes and Legislative Reports). As pointed out by defendants, this appeal does not involve a bankruptcy question but a contract dispute. In our opinion, the bankruptcy code definition of transfer was not a meaning contemplated by the parties at the execution of the listing agreement.

Black's Law Dictionary defines "transfer" as:

> An act of the parties, or of the law, by which the title to property is conveyed from one person to another. The sale and every other method, direct or indirect, of disposing of or parting with property or with an interest therein, or with the possession thereof, or of fixing a lien upon property or upon an interest therein, absolutely or conditionally, voluntarily or involuntarily, by or without judicial proceedings, as a conveyance, sale, payment, pledge, mortgage, lien, encumbrance, gift, security or otherwise....

BLACK'S LAW DICTIONARY 1497 (6th ed. 1990).

Webster's Dictionary defines "transfer" as "a conveyance of right, title, or interest in real or personal property from one person to another." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY, 1253 (1983). We are of the opinion that this last definition most closely represents a definition of "transfer" as contemplated by the parties.

Construed as a whole, the JVA contemplated a joint venture for the sale and development of the subject property along with the Walker Heirs properties by the Shackelfords and McCrory. It was McCrory's responsibility to develop the land, arrange the financing, and enter into the construction contracts. Shackelford's contribution was to convey clear title to the land owned by it to the purchasers upon its sale in increments to the individual buyers. There was no sharing of profits by McCrory until after the Shackelfords had received the full purchase price of $1,900,000.00.

By its terms, the JVA provided that the Shackelfords were to retain ultimate control over the property until the option price, $1,900,000, was paid, and that Shackelford and McCrory were to cooperate in the development of the property for the sale of same to individual buyers. Nowhere does the JVA provide or demonstrate that the subject property was transferred to McCrory, nor did McCrory acquire any incidence of ownership over the property, such as would amount to a "transfer."

The judgment of the chancellor is affirmed in all respects. Costs in this cause on appeal

are taxed to plaintiff, for which execution may issue if necessary.

CRAWFORD and FARMER, JJ., concur.